JUDGE KOELTL

07 CIV 7927

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: ALEXANDER J. WILLSCHER (NH 15313)
    RUA M. KELLY (MA 643351)
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2471

RECEIVED
SEP 10 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA              :
                                      :
        -v-                           :
                                      :
ALL RIGHT, TITLE AND INTEREST IN REAL : 07 Civ.
PROPERTY AND APPURTENANCES LOCATED AT :
███████████████████████,              : VERIFIED COMPLAINT
PORT ST. LUCIE, FLORIDA               :
                                      :
and                                   :
                                      :
ALL RIGHT, TITLE AND INTEREST IN REAL :
PROPERTY AND APPURTENANCES LOCATED AT :
410 FAIRFIELD DRIVE,                  :
SANFORD, FLORIDA                      :
                                      :
        Defendant-in-rem.             :
- - - - - - - - - - - - - - - - - - - x

Plaintiff United States of America, by its attorney, Michael J. Garcia, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

I. NATURE OF THE ACTION

1   This is an action by the United States of America seeking forfeiture of: (a) a single family residence located at ███████████████████████, in Port St. Lucie, Florida ("DEFENDANT PROPERTY 1"); and (b) a single family residence located at 410

Fairfield Drive, in Sanford, Florida ("DEFENDANT PROPERTY 1") (collectively, the "DEFENDANT PROPERTIES"). The DEFENDANT PROPERTIES are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 985, as real property which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. §§ 1341 and 1343, and as real property which constitutes and is derived from proceeds traceable to a conspiracy to violate 18 U.S.C. §§ 1341 and 1343.

## II. JURISDICTION AND VENUE

2   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

3   Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York, as described below.

## III. PROBABLE CAUSE FOR FORFEITURE

4   This action arises from an investigation of Judith Leekin, a/k/a "Judith S. Johnson, a/k/a "Judith Lee-Kin-De Johnson," a/k/a "Michelle Wells," a/k/a "Eastlyn J. Giraud," a/k/a "Ann Marie Williams," a/k/a "Cheryl Graham," for defrauding the New York State Office of Children & Family Services ("NYS OCFS") and the New York City Administration for Children's Services ("NYC ACS"). The investigation has revealed probable cause to believe that Leekin used several false aliases in order to adopt eleven children, many of who were mentally and/or

physically disabled. Leekin subsequently collected approximately $1,244,846 in adoption subsidies from New York City and New York State. Leekin used this money to support a lavish lifestyle for herself, while severely abusing her eleven adopted children. In addition, Leekin was collecting adoption subsidies for at least one of her adopted children for several years after she had removed him from her home.

### Leekin's Abuse of Her Eleven Adopted Children

5   On or about July 4, 2007, law enforcement officers of the Port St. Lucie (Florida) Police Department ("PSL PD") were contacted by an adopted child of Judith Leekin ("Adopted Child 1"). Adopted Child 1, who is 18 years old, informed the law enforcement officers that Leekin had abandoned him/her at a grocery store that was several hours away from their home. In addition, Adopted Child 1 reported that Leekin had abused him/her and the other adopted children.

6   On or about July 6, 2007, a police officer and child welfare officers went to the residence of Judith Leekin at DEFENDANT PROPERTY 1. Leekin was living with eight adopted children; four of whom were less than 18 years old ("Adopted Children 2-5"), and four of whom were mentally-handicapped adults ("Adopted Children 6-9"). While at DEFENDANT PROPERTY 1, the officers viewed both handcuffs and a large quantity of plastic ties, which can be used in lieu of handcuffs to secure a person's

hands or feet.  Leekin admitted that she used the ties to restrain her adopted children.  Leekin was not arrested at that time.  However, a follow-up visit was scheduled so that child-welfare officers could interview Adopted Children 2-9.

    7    On July 9, 2007, PSL PD officers returned to DEFENDANT PROPERTY 1 for the follow-up visit.  Leekin, however, had fled, taking with her Adopted Children 2-9.  PSL PD officer located a second residence of Leekin at DEFENDANT PROPERTY 2.  When law enforcement officers went to DEFENDANT PROPERTY 2, they located Leekin and Adopted Children 2-9.  Child custody officers took Adopted Children 2-5 into custody because they were juveniles.  The officers left Adopted Children 6-9 with Leekin.

    8    Following that visit, Leekin again fled, taking with her Adopted Children 6-9.  On or about July 12, 2007, PSL PD officers were able to locate Adopted Children 6-9, whom Leekin had left behind with a relative.

    9    Adopted Child 1 and Adopted Child 6 reported during interviews with law enforcement agents that during the 1990s, Leekin adopted Adopted Children 1-9 and two other adopted children ("Adopted Children 10-11") in New York City.  During this time, Leekin lived with Adopted Children 1-11 in Queens, New York.  Leekin forced Adopted Children 1-11 to live in the basement of her home and did not allow them to go to school, to go outside, or even to go upstairs.  In addition, Leekin commonly

used restraints to prevent Adopted Child 6 and Adopted Child 10 from getting out of their beds. Adopted Child 6 showed me several obvious scars on his/her head, which s/he reported were the resulted of physical abuse by Leekin.

10   Adopted Child 1 and Adopted Child 6 further reported that in or about 2004, Adopted Children 1-10 began living in DEFENDANT PROPERTY 1. Leekin forced the children to sleep in the garage and only permitted them to enter the house to use the bathroom or the kitchen. Leekin commonly restrained the adopted children using plastic ties. Leekin did not permit any of her children to attend school.

11   On July 18, 2007, PSL PD arrested Judith Leekin. She has been charged by the State of Florida with various crimes related to child abuse.

**Leekin Received Approximately $1,244,846 in Adoption Subsidies**

12   A review of records with the NYS OCFS and the NYC ACS indicates that adoption subsidies were paid to Leekin on behalf of Adopted Children 1-11 under the following aliases: "Michelle Wells," "Eastlyn Giraud," "Cheryl Graham," and "Anne Marie Williams." The records indicate that adoption subsidy checks were mailed to Leekin each month under those alias names. The adoption subsidy payments continued until in or about July 2007, at which time they were terminated. A total of approximately $653,980 in adoption subsides were paid to Leekin under the alias

"Michelle Wells." A total of approximately $338,989 in adoption subsides were paid to Leekin under the alias "Cheryl Graham." A total of approximately $203,133 in adoption subsides were paid to Leekin under the alias "Eastlyn J. Giraud." A total of approximately $48,835 in adoption subsides were paid to Leekin under the alias "Anne Marie Williams." In total, Leekin collected approximately $1,244,846 in adoption subsidies.

13   The NYC ACS requires adoptive parents who are receiving adoption subsidies from NYC ACS to submit an annual certification form (the "Certification Form"). The purpose of the Certification Form is to determine whether adoptive parents continue to be legally responsible for the support of their adopted children and whether the adoptive parents are still providing support. Adoptive parents must sign the Certification Form, and must submit a copy of either the adopted child's school report card, school attendance record, medical immunization card, or a drivers license/non-drivers identification card. Failure to submit the certification form may result in the suspension of subsidy payments to the adoptive parent.

14   In addition, New York State law requires that adoptive parents notify the State in the event that they either cease to be legally responsible for the child, or are no longer providing support.

15   The Certification Forms that were signed by "Cheryl

Graham" in 2005 and 2006. On those Certification Forms, "Cheryl Graham" claimed to be the adoptive mother of two children ("Adopted Child 7" and "Adopted Child 11"). In support of the application, "Cheryl Graham" submitted copies of a school report card from Ft. Pierce (Florida) Central High School for Adopted Child 11. Based on these submission to the NYC ACS, "Cheryl Graham" received adoption subsidies on behalf of Adopted Child 11 in 2005 and 2006. For example, "Cheryl Graham" received $19,824 in adoption subsidies in 2005.

16   An administrator at Ft. Pierce (Florida) Central High School reported that the report cards for Adopted Child 11 were fraudulent and that Adopted Child 11 has not ever attended the Ft. Pierce (Florida) Central High School.

17   Adopted Child 1 and Adopted Child 6 stated during interviews that Adopted Child 11 was severely mentally and physically handicapped. The extent of Adopted Child 11's handicaps were so severe that s/he could neither speak nor walk. Adopted Child 1 and Adopted Child 6 further reported that in or about 2000, Judith Leekin left the house and took Adopted Child 11 with her. Roughly an hour later, Leekin returned to the house without Adopted Child 11. Adopted Child 1 and Adopted Child 6 did not ever see Adopted Child 11 again, and Adopted Child 11 did not live with Leekin in 2005 or 2006.

18   A woman who babysat for Leekin's children (the

"Babysitter") stated during interviews that Leekin removed Adopted Child 11 from Leekin's home in or about 2000, and Adopted Child 11 did not later return to live with Leekin.

19   The investigation thus far has indicated that Judith Leekin had little or no other source of income besides the adoption subsidies she was receiving.  For example, law enforcement agents have interviewed a witness who lived with Leekin for between approximately one to two years in approximately 1997-1999 ("Witness 1").  Since Witness 1 moved out of Leekin's residence, s/he has maintained sporadic contact with Leekin.  Witness 1 stated that, with the exception of an approximately three-month period at which Leekin worked at a nursing home in approximately 2003, Leekin was not employed.  Likewise, law enforcement agents have interviewed a witness who was a close acquaintance of Leekin for the past several years ("Witness 2").  Witness 2 reported that, with the exception of an approximately three-month period at which Leekin worked at a nursing home, Leekin was not employed.

## THE DEFENDANT PROPERTIES

20   LEEKIN purchased the land upon which DEFENDANT PROPERTY 1 was built, on or about June 30, 1997 for $25,000.  On or about February 20, 1998, Leekin took out a mortgage on DEFENDANT PROPERTY 1 for approximately $164,700.  Leekin presently owes approximately $113,074.55 on that mortgage.  Witness 1 reported

during interviews that Leekin did not have a job at all between 1997 and 1999.

21   PSL PD officers have described the inside of DEFENDANT PROPERTY 1 as being lavishly furnished.  In particular, DEFENDANT PROPERTY 1 has very expensive landscaping, including palm trees lining a custom driveway, custom shutters, an expensive metal roof, and a pool.  DEFENDANT PROPERTY 1 also is furnished with leather furniture and a big screen TV.  Also one of the bedrooms inside of DEFENDANT PROPERTY 1 contains fancy furniture for a girl.

22   On March 24, 2005, LEEKIN purchased DEFENDANT PROPERTY 2 for approximately $185,750, and obtained a mortgage of $139,300.

## IV. CLAIM FOR FORFEITURE

23   Plaintiff repeats, realleges and incorporates by reference herein each and every allegation contained in paragraphs one through twenty-two of this Verified Complaint.

24   Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in Section 1956(c)(7) of [title 18]), or a conspiracy to commit such offense," is subject to forfeiture to the United States.

25   "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term includes any offense listed under 18 U.S.C. § 1961(1).  Section 1961(1) lists, among other offenses, violations of 18 U.S.C. § 1341 (relating to mail fraud) and violations of 18 U.S.C. § 1343 (relating to wire fraud).

26   For the foregoing reasons, there is probable cause to believe that the DEFENDANT PROPERTIES are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to the mail and wire fraud offenses.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the DEFENDANT PROPERTIES and that all persons having an interest in the DEFENDANT PROPERTIES be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the DEFENDANT PROPERTIES to the United States of America for disposition according to law and that this Court grant plaintiff such further relief as this Court may deem just

and proper together with the costs and disbursements in this action.

Dated:   New York, New York
         September 7, 2007

                            MICHAEL J. GARCIA
                            United States Attorney for
                            Plaintiff United States of America

                      By:   /s/ Alexander J. Willscher
                            ALEXANDER J. WILLSCHER (NH 15313)
                            RUA M. KELLY (MA 643351)
                            Assistant United States Attorney
                            One St. Andrew's Plaza
                            New York, New York 10007
                            (212) 637-2736/2471 (telephone)

11

VERIFICATION

STATE OF NEW YORK        )
COUNTY OF NEW YORK       :
SOUTHERN DISTRICT OF NEW YORK )

ANASTASIA CIONI, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"); that she has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of her knowledge, information and belief.

The sources of deponent's information and the grounds of her belief are his personal involvement in the investigation of JUDITH LEEKIN; official records and files of the FBI, other law enforcement records, documents obtained pursuant to subpoena, and conversations with members of ICE, the FBI, and local law enforcement agents.

_____
ANASTASIA CIONI
Special Agent,
Federal Bureau of Investigation

Sworn to before me this
___ day of September, 2007

_____
Notary Public

JEANETTE ANN GRAYEB
Notary Public, State of New York
No. 01GR4995793
Qualified in Kings County
Commission Expires Nov 30, 2009

12